FILED
CLERK, U.S. DISTRICT COURT

MAY   7 2014

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ERIC VALENZUELA,                    )  Case No. EDCV 13-0925-JPR
                                    )
            Plaintiff,              )
                                    )  **MEMORANDUM OPINION AND ORDER**
        vs.                         )  **AFFIRMING COMMISSIONER**
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social              )
Security,                           )
                                    )
            Defendant.              )
_____       )

## I.   PROCEEDINGS

    Plaintiff seeks review of the Commissioner's final decision
denying his applications for disability insurance benefits
("DIB") and supplemental security income ("SSI").  The parties
consented to the jurisdiction of the undersigned U.S. Magistrate
Judge under 28 U.S.C. § 636(c).  This matter is before the Court
on the parties' Joint Stipulation, filed January 31, 2014, which
the Court has taken under submission without oral argument.  For
the reasons stated below, the Commissioner's decision is affirmed
and this action is dismissed.

## II.  BACKGROUND

Plaintiff was born on October 8, 1986.  (Administrative Record ("AR") 200.)  He completed 11th grade, in part through special-education coursework.  (See AR 55, 323-423, 471.)

On June 15, 2004, Plaintiff filed an application for SSI, which was denied on November 17, 2004.  (See AR 61.)  On October 29, 2008, he filed applications for both DIB and SSI, alleging disability beginning October 8, 1996.  (Id.)  On November 19, 2010, an ALJ found that Plaintiff had severe impairments of "bilateral flat feet" and "mild mental retardation."  (AR 63.)  That ALJ found that Plaintiff had an RFC to do "medium work" but was limited to simple repetitive tasks and precluded from work with reading or math requirements.  (AR 65.)  The ALJ found that Plaintiff was able to perform jobs available in significant numbers in the national economy and therefore was not disabled.  (AR 69-70.)  The record does not indicate whether Plaintiff sought review by the Appeals Council; if so, he did not appeal that determination.

On March 24, 2011, Plaintiff filed the present applications for DIB and SSI.  (See AR 200-13.)  He alleged that he had been unable to work since April 1, 2008,[1] because of the following impairments: "[l]earning disability," "slow learner," "doesn[']t read and write well," "affection [sic] in the stomach," "bad bones," "allergies," "dry throat," and "runny eyes."  (See AR

---

[1]  Plaintiff acknowledged at the September 2012 hearing that he had in fact worked 27 hours a week or month – the record was not clear – until July 2012 taking care of his disabled mother.  (AR 36-37, 43.)

239.)  After his applications were denied initially and upon reconsideration, he requested a hearing before an ALJ.  (AR 153-54.)  A hearing was held on September 25, 2012, at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert and a medical expert, Joseph Malancharuvil, Ph.D., a clinical psychologist.  (AR 28-57, 507.)  In a written decision issued December 6, 2012, the ALJ determined that Plaintiff was not disabled.  (AR 9-21.)  On April 19, 2013, the Appeals Council denied his request for review.  (AR 1-3.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the

1  evidence can reasonably support either affirming or reversing,"
2  the reviewing court "may not substitute its judgment" for that of
3  the Commissioner. Id. at 720-21.
4  **IV.   THE EVALUATION OF DISABILITY**
5      People are "disabled" for purposes of receiving Social
6  Security benefits if they are unable to engage in any substantial
7  gainful activity owing to a physical or mental impairment that is
8  expected to result in death or which has lasted, or is expected
9  to last, for a continuous period of at least 12 months. 42
10 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257
11 (9th Cir. 1992).
12     A.   The Five-Step Evaluation Process
13     The ALJ follows a five-step sequential evaluation process in
14 assessing whether a claimant is disabled. 20 C.F.R.
15 §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,
16 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first
17 step, the Commissioner must determine whether the claimant is
18 currently engaged in substantial gainful activity; if so, the
19 claimant is not disabled and the claim must be denied.
20 §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not
21 engaged in substantial gainful activity, the second step requires
22 the Commissioner to determine whether the claimant has a "severe"
23 impairment or combination of impairments significantly limiting
24 his ability to do basic work activities; if not, a finding of not
25 disabled is made and the claim must be denied.
26 §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a
27 "severe" impairment or combination of impairments, the third step
28 requires the Commissioner to determine whether the impairment or

4

1 combination of impairments meets or equals an impairment in the
2 Listing of Impairments ("Listing") set forth at 20 C.F.R., Part
3 404, Subpart P, Appendix 1; if so, disability is conclusively
4 presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii),
5 416.920(a)(4)(iii).

6       If the claimant's impairment or combination of impairments
7 does not meet or equal an impairment in the Listing, the fourth
8 step requires the Commissioner to determine whether the claimant
9 has sufficient residual functional capacity ("RFC")[2] to perform
10 his past work; if so, the claimant is not disabled and the claim
11 must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The
12 claimant has the burden of proving he is unable to perform past
13 relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets
14 that burden, a prima facie case of disability is established.
15 Id.  If that happens or if the claimant has no past relevant
16 work, the Commissioner then bears the burden of establishing that
17 the claimant is not disabled because he can perform other
18 substantial gainful work available in the national economy.
19 §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination
20 comprises the fifth and final step in the sequential analysis.
21 §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966
22 F.2d at 1257.

23       B.   The ALJ's Application of the Five-Step Process
24       At step one, the ALJ found that Plaintiff had not engaged in
25 any substantial gainful activity since the alleged onset date,

26 _____

27       [2]   RFC is what a claimant can do despite existing
exertional and nonexertional limitations.  §§ 404.1545, 416.945;
28 see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

5

1    April 1, 2008.  (AR 12.)  At step two, she concluded that

2    Plaintiff had the following severe impairments: "allergies; mood

3    disorder, not otherwise specified; cannabis abuse; personality

4    disorder; organic mood disorder secondary to cannabis abuse;

5    schizophrenia; and learning disorder."  (Id.)  At step three, the

6    ALJ determined that Plaintiff's impairments did not meet or equal

7    a Listing.  (Id.)  At step four, she determined that Plaintiff

8    retained the RFC to perform "medium work,"[3] with some additional

9    limitations.  (AR 14.)  She found that Plaintiff had no past

10   relevant work.  (AR 20.)  At step five, the ALJ determined that

11   Plaintiff could perform jobs existing in significant numbers in

12   the national economy.  (Id.)  She therefore found that he was not

13   disabled.  (AR 21.)

14   **V.   DISCUSSION**

15        The ALJ Properly Assessed Plaintiff's Intellectual

16        Impairment

17        Plaintiff challenges only the ALJ's determination that he

18   failed to establish a severe impairment of borderline

19   intellectual functioning.[4]  (J. Stip. at 3; see AR 13.)

20

21

22        [3]    "Medium work" involves "lifting no more than 50 pounds

23   at a time with frequent lifting or carrying of objects weighing
     up to 25 pounds."  §§ 404.1567(c), 416.967(c).

24

25        [4]    "Borderline intellectual functioning" indicates that a
     person has below-average cognitive ability, that is, an IQ of 71

26   to 85, but the deficit is not as severe as "mental retardation,"
     which is defined as having an IQ of 70 or below.  Baines v.

27   Astrue, No. EDCV 09-1121-MLG, 2011 WL 3759040, at *3 (C.D. Cal.
     Aug. 25, 2011) (citing Diagnostic and Statistical Manual of

28   Mental Disorders (4th ed. 1994)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.   Applicable law

At step two of the sequential evaluation process, the claimant has the burden to show that he has one or more "severe" medically determinable impairments that can be expected to result in death or last for a continuous period of at least 12 months. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5, 96 L. Ed. 2d 119 (1987) (claimant bears burden at step two); Celaya v. Halter, 332 F.3d 1177, 1180 (9th Cir. 2003) (same); 20 C.F.R. §§ 404.1508, 416.908 (defining "physical or mental impairment"); §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (claimants not disabled at step two if they "do not have a severe medically determinable physical or mental impairment that meets the duration requirement").  A medically determinable impairment must be established by signs, symptoms, or laboratory findings; it cannot be based solely on a claimant's own statement of his symptoms.  §§ 404.1508, 416.908; Ukolov v. Barnhart, 420 F.3d 1002, 1004-05 (9th Cir. 2005); SSR 96-4p, 1996 WL 374187, at *1 (July 2, 1996); see also 42 U.S.C. § 423(d)(3) ("physical or mental impairment" "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques").  A "medical sign" is "an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques."  Ukolov, 420 F.3d at 1005 (quoting SSR 96-4p, 1996 WL 374187, at *1 n.2 (July 2, 1996) (internal quotation marks omitted)); accord §§ 404.1528(b), 416.928(b).

To establish that a medically determinable impairment is "severe," moreover, the claimant must show that it "significantly

7

limits [his] physical or mental ability to do basic work activities."[5]   §§ 404.1520(c), 416.920(c); accord §§ 404.1521(a), 416.921(a).   "An impairment or combination of impairments may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."   Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (emphasis in original, internal quotation marks omitted); see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) ("[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims.").   Thus, a court must determine whether an ALJ had substantial evidence to find that the medical evidence clearly established the claimant did not have a medically severe impairment or combination of impairments.   Webb, 433 F.3d at 687.

B.   Relevant background

The record includes documentation of Plaintiff's performance in elementary, junior-high, and high school.   (See AR 323-433.) Every three years, Plaintiff was assessed by a school psychologist according to the mandates of his school district's special-education program.   (See AR 396-97.)   Plaintiff's performance on cognitive tests produced the following scores:

---

[5]      "Basic work activities" include, among other things, "[u]nderstanding, carrying out, and remembering simple instructions"; using judgment; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." §§ 404.1521(b), 416.921(b); accord Yuckert, 482 U.S. at 141.

| | 1992 | 1995 | 1998 | 2002 |
|---|---|---|---|---|
| Verbal | 71 | 56 | 70 | 57 |
| Performance | 79 | 74 | 74 | 86 |
| **Full-Scale** | **73** | **62** | **70** | **68** |

(AR 399.)[6]  The most recent of those reports classified Plaintiff's 2002 verbal, performance, and full-scale IQ scores as, respectively, deficient, low average, and deficient to borderline.[7]  (Id.)  Plaintiff's 2002 scores "appear[ed] to be reliable and valid because of his cooperativeness, willingness to try, and background characteristics."  (Id. (Barstow Unified School District Pupil Services Department Triennial Evaluation Multi-Disciplinary Report).)

On April 11, 2009, psychologist Kim Goldman performed a complete psychological evaluation of Plaintiff.  (AR 449-52.) Dr. Goldman gave Plaintiff the Wechsler Adult Intelligence test

---

[6]    In 1992, 1995, and 1998, Plaintiff was assessed using the Weschler Intelligence Scale for Children - Third Edition, and in 2002, he was assessed using the Kaufman Brief Intelligence Test.  (AR 399.)  These assessments comprise subtests that provide verbal, performance, and full-scale IQ scores.  (See AR 399-400); L. Keith, Intelligence Tests Used in Assessment for Learning Disabilities, http://childparenting.about.com/cs/ learningproblems/a/wisciii_2.htm (last visited May 5, 2014).  The verbal IQ comprises the subtests that measure verbal comprehension.  (AR 399-400); Keith, supra.  The performance IQ includes subtests that measure perceptual organization and other primarily nonverbal intellectual abilities.  (AR 400); Keith, supra.  The full-scale IQ score is a composite of all the subtests.  (AR 399); Keith, supra.

[7]    Full-scale IQ scores between 90 and 109 are considered average.  Keith, supra n.6.  Scores of 80 to 89 are low average, 70 to 79 are borderline, and below 70 are intellectually deficient.  Id.; Percentile Ranks & Classification Ratings, http://faculty.pepperdine.edu/shimels/Courses/Files/Class%20Ratin gs.pdf (last visited May 5, 2014).

but warned that the results "should be interpreted with caution" because "[i]t was unclear as to whether or not claimant made an adequate effort on the tasks presented to him." (AR 451.) Plaintiff attained a verbal IQ score of 65, performance IQ score of 67, and full-scale IQ score of 63, all of which were in the "extremely low" range. (Id.) Dr. Goldman also gave Plaintiff the Test of Memory Malingering[8] and reported that Plaintiff's "performance reflects that he is attempting to simulate cognitive impairment." (Id.)

Dr. Goldman diagnosed "Borderline Intellectual Functioning, Rule Out Mental Retardation, Mild." (Id.) She opined that Plaintiff was incapable of handling funds. (AR 452.) She found that Plaintiff had no difficulties in maintaining social functioning; moderate to marked difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of "emotional deterioration" in worklike settings. (Id.) She opined that his ability to understand, carry out, and remember simple instructions was not impaired. (Id.) His ability to do the same with detailed instructions and complex tasks, however, was markedly impaired by limits in his cognitive functioning. (Id.) Although Plaintiff's ability to respond appropriately to coworkers, supervisors, and the public was not impaired, his ability to respond appropriately to typical work situations and changes in work setting was moderately to markedly impaired.

---

[8]    The Test of Memory Malingering is a visual-recognition test designed to help mental-health practitioners distinguish between true and feigned memory impairments. See TOMM™ Test of Memory Malingering (TOMM), http://www.mhs.com/product. aspx?gr=cli&prod=tomm&id=overview#top.

(Id.)

Dr. Goldman opined that Plaintiff's ability to read, comprehend, and complete a four-page history form with his father's assistance indicated that he was "likely functioning in the borderline rather than mentally retarded range of intelligence." (Id.) She found that Plaintiff's performance on the mental-status exam also suggested that he was functioning at the "low borderline range." (Id.) She opined that Plaintiff "would likely be able to participate in competitive employment performing simple and repetitive tasks" but "may require the initial assistance of a job coach to help him learn job related tasks." (Id.)

On July 30, 2011, consulting psychiatrist Dr. Marshall Jeffrey Handleman performed a complete psychological evaluation of Plaintiff. (AR 470-74.) Although Dr. Handleman did not perform a formal IQ assessment, he noted evidence of intellectual impairment: Plaintiff's delayed rate of speech, his difficulty being linear and goal directed, and some disorganization of his thought processes. (AR 472.) Dr. Handleman reported that although Plaintiff registered three of three items at zero minutes, he could not recall any of them after five minutes. (Id.) Plaintiff demonstrated "problems with Mathematics" when asked to subtract serial sevens and serial threes from 100. (Id.)

Dr. Handleman diagnosed Plaintiff at Axis II as having a learning disability and at Axis IV as suffering from psychosocial stressors, including problems with education and learning,

1   occupation, and finance.[9]  (AR 473.)  Dr. Handleman noted

2   Plaintiff's "learning problems since birth" and trouble with

3   concentration and memory.  (Id.)  He opined that Plaintiff could

4   not shop but "possibly will help when directed with some chores

5   and cooking."  (Id.)  Plaintiff's capacity for self-care and

6   safety precautions was adequate.  (Id.)  His cognition,

7   orientation, and memory were heavily impaired, and his abstract

8   thinking was markedly impaired.  (Id.)

9        Dr. Handleman opined that Plaintiff had moderate limitations

10  in activities of daily living, social functioning, and

11  maintaining concentration, persistence, and pace.  (Id.)  He

12  noted mild limitations in maintaining composure and even

13  temperament and moderate limitations in Plaintiff's level of

14  personal independence.  (Id.)

15       Dr. Handleman opined that in a work setting Plaintiff would

16  have mild limitations performing simple and repetitive tasks and

17  moderate limitations performing detailed and complex ones.  (AR

18  474.)  Plaintiff would have moderate limitations in performing

19  work activities absent additional supervision and in completing a

20

21       [9]   The revised fourth edition of the Diagnostic and
22  Statistical Manual of Mental Disorders ("DSM-IV-TR") provided for
    diagnosis according to a five-axis system.  See Multiaxial
23  Assessment, DSM-IV-TR Classification, available at:
    http://wps.prenhall.com/wps/media/objects/219/225111/
24  CD_DSMIV.pdf.  In addition to the primary clinical diagnosis or
    diagnoses ("Axis I"), the system provided for diagnosis of other
25  conditions affecting the Axis-I diagnosis, including intellectual
    disabilities or personality disorders ("Axis II") and
26  psychosocial and environmental problems ("Axis IV").  Id.  The
    fifth edition of the DSM has revised the multiaxial system to
27  reflect relationships among the diagnostic axes.  See Diagnostic
    and Statistical Manual of Mental Disorders 17 (5th ed. 2012).
28

                                12

normal workday or workweek.  (Id.)  He would have mild
limitations in accepting instruction, interacting with others,
and handling the usual demands of gainful employment.  (Id.)

At the hearing, medical expert Dr. Malancharuvil testified
that Plaintiff had "a condition . . . reported as borderline
intellectual functioning with circumscribed learning disability."
(AR 44.)  Dr. Malancharuvil explained:

> Circumscribed learning disability means that he doesn't
> have a progressive problem with learning.  His verbal
> performance IQ is one standard deviation above his verbal
> IQ.   He  has  difficulty  with  verbal  learning  and
> processing information, particularly articulating speech
> at [sic] what he wants to say.  It's difficult for him to
> express himself; however, he has normal or below average,
> dull normal abilities in performance intelligence.  For
> example, in construction, in doing things, in using his
> hands.  Example [sic] would be cooking or vacuuming or
> other types of things in terms - is normal and when there
> is a discrepancy between performance IQ and verbal IQ[,]
> [g]enerally it is attributed to either some sort of a
> brain problem or a learning disability, and so he's not
> totally incapable of learning or his learning problems
> are not progressive in all areas of his abilities, but it
> is  circumscribed  to  verbal  expression  and  verbal
> quotient.

(AR 44-45.)

Based on his assessment of Plaintiff's intellectual and
psychological functioning, Dr. Malancharuvil opined that he

13

suffered mild limitations in activities of daily living; mild to moderate limitations in social functioning; and mild to moderate limitations in maintaining concentration, persistence, or pace. (AR 45.)  Dr. Malancharuvil opined that Plaintiff retained the capacity "at least for simple repetitive tasks in an object oriented setting with no requirement of any type of serious reading or arithmetic calculations." (Id.)  Plaintiff "probably can read simple signs and one sentence directions" but would be best accommodated by a job "without too much change" and involving "very simple and repetitive tasks." (Id.)  The medical expert said he wouldn't trust Plaintiff with safety operations because of his marijuana use. (Id.)  Dr. Malancharuvil further noted that if Plaintiff were to cease his marijuana use, "given his performance IQ, he should be able to do even better."[10] (Id.)

Dr. Malancharuvil found Dr. Handleman's assessment to be "really problematic" because it contained no Axis-I diagnosis and assessed mild limitations but "describes [Plaintiff] as almost incapable of functioning." (AR 47.)  Dr. Malancharuvil opined that Plaintiff was "middle average, above borderline level." (AR 50.)

Although given the opportunity, Plaintiff's counsel did not

---

[10]   A claimant whose drug addiction is a contributing factor material to a determination of disability is not entitled to benefits.  See 42 U.S.C. § 423(d)(2)(C); Ball v. Massanari, 254 F.3d 817, 821, 824 (9th Cir. 2001).  The Social Security regulations provide that "[t]he key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol." §§ 404.1535(b)(1), 416.935(b)(1).

14

examine the medical expert.  (Id.)

The ALJ found that Plaintiff established severe impairments, including a learning disorder.  (AR 12.)  She noted Dr. Handleman's "positive clinical findings" supporting his diagnosis of a learning disability and his opinion as to Plaintiff's work-related limitations.  (AR 18.)  She also noted Plaintiff's school records, which the ALJ found "documented a history of learning disorder."  (AR 16.)

The ALJ determined, however, that "borderline intellectual functioning is not a medically determinable impairment" because it was not supported by "objective evidence in the record."  (AR 13.)  She noted that impairments must be established by evidence from an acceptable medical source using acceptable clinical and laboratory diagnostic techniques, and she found that Dr. Malancharuvil's designation of borderline intellectual functioning was not supported by such evidence.  (AR 13, 19.)

The ALJ found that the combined impact of Plaintiff's mental-health and intellectual impairments led to a mild restriction in activities of daily living and moderate restriction in social functioning and maintaining concentration, persistence, or pace.  (AR 13.)  She found that he had suffered one or two episodes of decompensation of extended duration attributable to his mental-health issues.  (AR 14.)

The ALJ determined that Plaintiff retained the RFC to perform "medium work," with some additional limitations.  (Id.)  Specifically, she found that Plaintiff "only has the ability to understand, remember and carry out simple routine tasks in an object-oriented setting with no requirement for serious reading

15

or arithmetic operations, not in charge of any safety type of operations and must avoid exposure to grass," presumably because of Plaintiff's allergies.  (Id.)

C.   Analysis

1.   *The ALJ did not err*

Although the ALJ found that Plaintiff had a severe impairment in his learning disorder, she determined that "borderline intellectual functioning is not a medically determinable impairment" because it was not supported by "objective evidence" in the record.  (AR 12-13.)

Plaintiff contends that the ALJ erred in rejecting Dr. Malancharuvil's finding that Plaintiff suffered from borderline intellectual functioning as "unsupported by the record" (AR 19) because the opinion was supported by Plaintiff's 2002 full-scale IQ score of 68 (AR 68), 2009 full-scale IQ score of 63 (AR 451), and Dr. Goldman's diagnosis of "borderline intellectual functioning, rule out mental retardation mild" (id.).  (J. Stip. at 3-4.)

First, although Dr. Malancharuvil noted a report of borderline intellectual functioning (AR 44), he also opined that Plaintiff was "middle average, above borderline level" (AR 50). That inconsistency alone provided a basis for the ALJ to reject the former finding.  See Matney ex rel. Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) ("inconsistencies and ambiguities" in doctor's opinion were specific and legitimate reasons for rejecting it).  Moreover, Dr. Malancharuvil credited the findings that Plaintiff suffered from a learning disability but specifically noted that the disability was "circumscribed" to

16

his capacity for verbal processing and expression; thus, he
opined that Plaintiff would be slow to take in new information
but would not be significantly impeded in his ability to perform
a task once he had processed that information.  (See AR 44-45.)
Notably, although it was Plaintiff's burden to establish a
medically determinable impairment of borderline intellectual
functioning, his counsel refused the opportunity to examine the
medical expert regarding his opinion that Plaintiff was "above
borderline level."  (AR 50); see Solorzano v. Astrue, No. ED CV
11-369-PJW, 2012 WL 84527, at *6 (C.D. Cal. Jan. 10, 2012)
(noting counsel's "obligation to take an active role and to raise
issues that may impact the ALJ's decision while the hearing is
proceeding so that they can be addressed").

Second, because the previously assigned ALJ considered
Plaintiff's intellectual impairment in denying his applications
for disability (see AR 63-65), the present ALJ focused her
assessment on new and material evidence not presented in the
prior proceeding.  (See AR 10); §§ 404.988(b), 404.989(a)(1)
(allowing Secretary to reopen decision only if "good cause"
exists, as when "[n]ew and material evidence is furnished").
Thus, although the ALJ considered all record evidence (AR 16),
she directed Dr. Malancharuvil to limit his assessment of
Plaintiff's impairments to the period beginning November 2010 (AR
44), for which the primary evidence of intellectual impairment
was Dr. Handleman's diagnosis of a learning disability, not

borderline intellectual functioning (AR 473).[11]

In any event, the April 2009 assessment of consulting psychologist Goldman noted evidence of malingering.  Although Dr. Goldman reported Plaintiff's full-scale IQ to be 63 and diagnosed borderline intellectual functioning, rule out mild mental retardation (but see, supra, n.3 (full-scale score below 70 indicates mental retardation)), she advised caution in interpreting those results because "[i]t was unclear . . . whether or not the claimant made an adequate effort" (AR 451; see also id. (reporting that Plaintiff's scores on Test of Memory Malingering "reflect[] that he is attempting to simulate cognitive impairment")).  Moreover, in addition to noting the unreliability of Plaintiff's allegedly feigned results and their implications for his credibility (AR 67), the earlier ALJ found this score "not conclusive" because it "does not reflect claimant's true cognitive functioning" as evidenced by his "adaptive functioning," including shopping for his mother, cooking, cleaning, and caring for his personal needs (AR 65).

The ALJ in this case noted that Plaintiff's activities during the relevant period similarly suggested fewer restrictions than he alleged.  Although the ALJ found his post-onset work did not amount to substantial gainful activity, she noted that it showed he "was more active and able to engage in more activities than he alleged."  (AR 15; see AR 12, 216-18, 223-24, 321.)  Further, Plaintiff described daily activities of going out alone,

---

[11]    Plaintiff cites no basis for his contention that Dr. Handleman's finding that Plaintiff had a learning disorder amounted to a finding of borderline intellectual functioning. (J. Stip. at 4.)

18

using public transportation, shopping, and doing household chores, which the ALJ found required physical and mental capabilities and social functioning transferrable to a work environment. (AR 15; see AR 250-52.) Plaintiff does not challenge these findings.

Plaintiff argues that his low childhood and adolescence IQ scores show that he was not putting forth substandard effort more recently. (J. Stip. at 4.) But Plaintiff's school-reported IQ scores varied significantly. (See AR 399 (verbal scores ranging from 56 to 71, performance scores ranging from 74 to 86, and full-scale scores ranging from 62 to 73).) Thus, although they are sufficient to establish that any intellectual impairment existed in his youth (see AR 16, 68), they do not undermine the recent malingering finding and are unreliable for pinpointing Plaintiff's present level of intellectual functioning and his capacity for work-related activities (see AR 15, 68).

When, as here, substantial evidence supported the ALJ's finding that Plaintiff suffered from a severe impairment of learning disability, not borderline intellectual functioning, see Moore v. Comm'r of Soc. Sec., 500 F. App'x 638, 640 (9th Cir. 2012) (holding ALJ did not err in declining to find severe impairment of borderline intellectual functioning when sole evidence was diagnosis by psychologist who nonetheless opined that claimant had "requisite cognitive skills" for employment), this Court may not substitute its judgment for that of the Commissioner, see Reddick, 157 F.3d at 720-21.

### 2. *Any error was harmless*

Even had the ALJ erred in finding that Plaintiff suffered from a learning disorder but not borderline intellectual functioning, that error would have been harmless because the ALJ nonetheless considered his mental limitations and implemented restrictions appropriate to his intellectual impairment into the RFC. (<u>See</u> AR 14); <u>cf.</u> <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007) (noting step-two error harmless when ALJ accounts for resulting limitations later in sequential evaluation process). Thus, to the extent the evidence reflected that Plaintiff's intellectual impairment would affect his ability to work, the ALJ adopted limitations consistent with both Dr. Malancharuvil's and Dr. Handleman's recommendations, restricting Plaintiff to "simple routine tasks" carried out in "an object-oriented setting with no requirement for serious reading or arithmetic operations" and no responsibility for "any safety type of operations." (AR 14; <u>see</u> AR 45 (Dr. Malancharuvil testifying that Plaintiff retained capacity "at least for simple repetitive tasks in an object oriented setting with no requirement of any type of serious reading or arithmetic calculations" and no "safety operations"), 474 (Dr. Handleman finding only mild limitations performing simple and repetitive tasks).)

Indeed, these restrictions are consistent with those recommended by Dr. Goldman, who assessed (based on potentially flawed data) borderline intellectual functioning, rule out mild mental retardation, and those of the prior ALJ, who found a

severe impairment of mild mental retardation.[12]   (See AR 452 (Dr. Goldman opining that Plaintiff's "ability to carry out and remember simple instructions is not impaired" and "[h]e would likely be able to participate in competitive employment performing simple and repetitive tasks"), 65 (RFC limiting Plaintiff to "simple repetitive tasks" and no "work with reading or math requirements").)  Therefore, it does not appear that the ALJ's classification of Plaintiff's mental impairment had any measurable effect upon her RFC determination; nor does Plaintiff point to any limitation related to borderline intellectual functioning that was not incorporated into his RFC.  Cf. Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005) (noting claimant did not "point[] to any evidence of functional limitations" that "would have impacted the ALJ's analysis").  Thus, even if the ALJ had erred in failing to include borderline intellectual functioning among Plaintiff's severe impairments, any error would have been harmless.  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (finding error harmless when "the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion").

Remand is not warranted.

---

[12]   Plaintiff does not dispute that the present ALJ was free to reassess this determination based on the new evidence. Cf. Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1172-73 (9th Cir. 2008) (medical evaluations conducted after prior adjudication constitute new and material evidence, based on which ALJ may diverge from previous RFC determination).

VI.   CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.


DATED: May 7, 2014

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[13]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

22